IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RENIA CANTEBERRY,

      Plaintiff,

v.

COUNTY OF COOK, d/b/a JOHN H.
STROGER, JR. HOSPITAL[1]

      Defendant.

Case No. 23 C 3984

Hon. LaShonda A. Hunt

## MEMORANDUM OPINION AND ORDER

Renia Canteberry ("Plaintiff") brought this suit against County of Cook, d/b/a John H.

Stroger, Jr. Hospital[1] ("Defendant") for failure to accommodate (Count I), interference (Count II),

and discrimination (Count III) in violation of the Americans with Disabilities Act (ADA), 42

U.S.C. § 12101 *et seq*. Defendant has moved for summary judgment on all of Plaintiff's claims.

(Dkt. 39). For the reasons discussed below, Defendant's motion is granted.

## BACKGROUND[2]

### I.    Plaintiff's Employment with Defendant

Plaintiff is employed as a "Cashier III" in the Finance Department at Stroger Hospital, a

position she has held since March 2008. (Dkt. 49 at ¶ 2; Dkt. 55 at ¶ 7). At all relevant times, her

manager was Denise Brown ("Brown"). (Dkt. 49 at ¶ 12). From 2015 to 2022, Brown, whose title

---

[1] Defendant also refers to itself as "Cook County Health and Hospitals System" throughout its filings in this case.

[2] The facts are taken from the parties' respective Local Rule 56.1 statements and are undisputed unless otherwise noted. The Court refers to Plaintiff's Objections and Responses to Defendant's Local Rule 56.1(a)(3) Statement of Material Facts as "Dkt. 49" and Defendant's Response to Plaintiff's Statement of Additional Material Facts Pursuant to Local Rule 56.1(b)(3) as "Dkt. 55."

was "Business Manager III," reported to Kelli Thomas ("Thomas"), Director of the Finance Department at Stroger Hospital. (*Id.* at ¶¶ 12, 14).

There are two "Cashier IIIs" within the Finance Department—Sherri Moore ("Moore"), who has worked for Defendant for over twenty years, and Plaintiff. (*Id.* at ¶ 10). Cashier IIIs are responsible for processing payments at the pharmacy and the main office. (*Id.* at ¶¶ 11, 20). The cashier working in the pharmacy processes payments for prescriptions only, while the cashier working in the main office processes payments for bills, mail order prescriptions, and other miscellaneous payments. (*Id.* at ¶ 19). Although the Cashier III position used to involve additional responsibilities, Defendant either gradually removed them or Brown transferred them to the Cashier II position that supervises the Cashier IIIs. (*Id.* at ¶¶ 17, 20).

Cashier IIIs work one of two shifts—the first from 7:00AM to 3:00PM and the second from 1:00PM to 9:00PM. (*Id.* at ¶ 11). Plaintiff is assigned to the 1:00PM to 9:00PM shift. (*Id.* at ¶ 21). According to Plaintiff, her shift includes "rush hour," meaning more patient traffic at the pharmacy window. (*Id.* at ¶ 21). The parties dispute whether the main office window is as busy as the pharmacy window, but resolution of the question is not relevant to the analysis. (*Id.*). Cashier IIIs used to rotate shifts but Brown discontinued that practice when she assumed her role as Business Manager III. (*Id.* at ¶ 16). Brown oversees scheduling and discipline. (*Id.* at ¶ 13)

At all relevant times, cashiers working at Stroger Hospital were subject to terms and conditions of employment outlined in a collective bargaining agreement (CBA) between Defendant and the American Federation of State, County, and Municipal Employees. (Dkt. 49 at ¶ 9).[3] The CBA provides a pay scale which determines annual pay increases and outlines seniority

---

[3] Defendant neglected to include a copy of the applicable CBA as an exhibit but notes that it is publicly available using the following link: https://opendocs.cookcountyil.gov/human-resources/labor-agreements/2020-2024/2020-2024_AFSCME_1111_1178_1276_CBA_10-01-2021.pdf.

among employees. (*Id.*). The assignment of shifts is based on seniority, and the most senior Cashier III receives preferential consideration for shift assignments. (*Id.* at ¶ 15).

II.     **Plaintiff's Requests for Accommodation**

Plaintiff suffers from spinal stenosis, cervical radiculopathy, bilateral carpal tunnel syndrome, high blood pressure, generalized anxiety disorder, adjustment disorder with mixed anxiety and depressed mood, and PTSD. (Dkt. 49 at ¶ 4). In 2015, Plaintiff began taking intermittent FMLA leave for her cervical spine condition. (*Id.* at ¶ 27).

In 2017, Defendant consolidated several pharmacies within its facility into one main pharmacy, which resulted in the pharmacy no longer having multiple windows where cashiers could work. (Dkt. 49 at ¶¶ 18, 22, 49). On more than one occasion, Brown, Thomas, and Thomas's boss asked if the pharmacy could open another window after the consolidation to spread out traffic, but each request was denied. (Dkt. 49 at ¶ 23; Dkt. 55 at ¶¶ 14, 15). According to Brown, she and Thomas asked for an additional window in the pharmacy both before and after Plaintiff's complaints about the increased workload. (Dkt. 55 at ¶ 14). But Pharmacy Director CaTanya Norwood ("Norwood") advised them that the other windows in the pharmacy were reserved for processing prescriptions. (Dkt. 49 at ¶ 23).

Due to the increased patient traffic, Plaintiff believes that her carpal tunnel syndrome worsened after the consolidation of the pharmacies and the lack of shift rotations; however, she was not formally diagnosed with carpal tunnel syndrome until 2022. (*Id.* at ¶¶ 22, 29). Plaintiff believes that the repetitive pulling of receipts caused that condition. (*Id.* at ¶ 30).

The parties dispute when Plaintiff first requested any accommodation. Plaintiff claims that she had been requesting accommodations from 2017 to 2023, and that any "accommodations" granted within that time frame were "temporary restrictions" revisited after a period of time, rather

than reasonable accommodations. (Dkt. 49 at ¶¶ 52, 55-56, 59; Dkt. 55 at ¶¶ 13, 14). Specifically, Plaintiff states that she regularly asked Brown and Thomas for help in the pharmacy, including an additional cashier in the pharmacy, rotating with other employees, switching assignments, or splitting shifts. (Dkt. 49 at ¶¶ 50, 59; Dkt. 55 at ¶¶ 13, 14). Plaintiff told Brown and Thomas that the work was hurting her hands, neck, and back. (Dkt. 49 at ¶ 50; Dkt. 55 at ¶¶ 13, 14).

Defendant, on the other hand, contends that Plaintiff first requested an accommodation on or about August 17, 2019, when her doctor recommended that Plaintiff receive an accommodation of a 15-minute break every two hours. (*Id.* at ¶ 55). According to Defendant, Plaintiff was released to work with restrictions on "handling, fingering, twisting, grasping," and as requested, granted the accommodation recommended by her doctor that same day. (*Id.* at ¶¶ 55-56). Less than two weeks later, though, Plaintiff had her doctor remove the restrictions because she did not like that the 15-minute breaks every two hours (totaling one hour every shift) took the place of her one-hour paid lunch break as dictated by the CBA between Defendant and Plaintiff's union. (*Id.* at ¶¶ 57-58). Plaintiff was thus released to work without restrictions on August 28, 2019. (*Id.* at ¶ 57).

Plaintiff asserts that in March 2018, Defendant had granted her a temporary restriction which allowed her to take a 15-minute break every two hours in addition to her one-hour lunch break. (*Id.* at ¶ 56). After her next formal request for accommodation was submitted in 2023, Plaintiff was permitted to work an 8:00AM to 4:00PM shift while the request was being processed. (*Id.* at ¶¶ 52, 60). That accommodation request was eventually granted, and Plaintiff continues to work under it today, splitting her shifts between the main office and the pharmacy. (*Id.* at ¶ 62).

Nicholas Krasucki ("Krasucki"), a licensed attorney who served as Defendant's Equal Employment Opportunity (EEO) Director for most of the applicable timeframe in this case, testified that when the EEO office received notice from an employee about a physical impairment

4

which is causing him or her to struggle with the job, the EEO office could not ignore that communication and was obligated to begin the interactive process required under the ADA at that time. (Dkt. 55 at ¶¶ 18-19). According to Krasucki, only the employee, the employee's supervisor, and the EEO office would be necessary for the accommodation process. (*Id.* at ¶ 19).

On February 9, 2021, Plaintiff emailed Krasucki, informing him that Brown would not provide her with help "needed to perform [her] job" despite knowing about the high volume of traffic at the pharmacy; suggesting that shifts be split so as to not "burn/stress out the only Cashier on duty;" and stating that she "must endure [the high volume of patients] with two document[ed] health conditions," "must call off at time under FMLA because [her] health condition is being exacerbated," and that her "right arm is in pain daily from ripping slips from 200 plus receipts daily" requiring her to "take pain medication at night to sleep." (Dkt. 49 at ¶ 39; Dkt. 55 at ¶ 21). Plaintiff also wrote that she had "been singled out having to endure this before in 2018/19." (Dkt. 55 at ¶ 21). Krasucki testified that he did not consider Plaintiff's email to be a request for an accommodation. (Dkt. 49 at ¶ 39).

III.     **Plaintiff's Other Complaints**

In 2017 and 2021, Plaintiff interviewed for a Cashier II position, which Defendant asserts she did not receive because she lacked preferred credentials and failed to fully answer some questions during the interview process. (Dkt. 55 at ¶¶ 63, 71). On March 1, 2019, Plaintiff complained to Krasucki that Brown was harassing and bullying her because she had applied for a supervisor position. (*Id.* at ¶ 38). In October 2020, Plaintiff filed a grievance regarding her shift and work schedule, claiming an "unfair distribution of duties" in violation of the CBA. (*Id.* at ¶ 51). The grievance was dismissed; Plaintiff lacked seniority when it came to scheduling. (*Id.*).

Plaintiff contends that Brown repeatedly treated her unfairly. (Dkt. 49 at ¶ 32). As examples, she claims that Brown has refused to approve Plaintiff's vacation time on multiple occasions, assign additional workers to help Plaintiff during her shift, allow Plaintiff to work in the main office, allow Plaintiff to leave work early on holidays, assign temporary workers to assist Plaintiff during her shift, and invite Plaintiff to parties at Brown's home. (*Id.* at ¶¶ 32, 45). Additionally, Plaintiff states that Brown blocked Plaintiff's number on her work phone and sent Plaintiff mail order payments, which could be twenty pages long, to process "as punishment," and sent Plaintiff emails she considered to be "derogatory" because they were critical of Plaintiff's work and accused her of breaking office equipment. (*Id.* at ¶¶ 32-33, 44). Finally, Plaintiff says Brown mocked her by mimicking Plaintiff's "hoarse" voice over the phone, made a comment to Plaintiff about a "short little yellow school bus," and questioned whether Plaintiff really had impairments. (*Id.* at ¶¶ 34, 37).

When asked, Plaintiff said she does not know why Brown has treated her that way and Brown just did not like her. (*Id.* at ¶ 35). She testified that it may have been because Plaintiff knew about Brown's alleged affair with a former employee. (*Id.* at ¶ 36). Plaintiff also believed that her assignment to the 1:00PM to 9:00PM shift was discriminatory because "no one else had to do it." (*Id.* at ¶ 32). In addition to the alleged mistreatment, Brown issued Plaintiff numerous written reprimands over the years for things such as smoking on campus, not obeying Defendant's mask mandate, failing to collect receipts from processed payments, threatening her, and failing to properly specify whether she was taking FMLA leave or another type of leave. (*Id.* at ¶ 48). None of these reprimands has ever resulted in suspension. (*Id.*).

Plaintiff was not alone in complaining about Brown. Sherri Bester-Lloyd ("Bester-Lloyd"), a former Cashier II, filed an EEO complaint against Brown and testified that Brown would do

"spiteful things to [her]," including refusing to approve sick leave or vacation time requests and changing her schedule from a supervisory Cashier II role to a Cashier III role. (*Id.* at ¶¶ 40-41). According to Bester-Lloyd, Brown changed employees' schedules when she "[got] upset." (*Id.* at ¶ 41). In her complaint, Bester-Lloyd identified another employee who allegedly experienced similar treatment from Brown in terms of scheduling changes. (*Id.* at ¶ 42). Although Bester-Lloyd sought FMLA leave for a medical condition, she said that Brown's behavior never prevented her from taking that leave and that she did not believe Brown's conduct was motivated by discriminatory animus. (*Id.* at ¶ 43). Instead, Bester-Lloyd believed that was just how Brown was, and Brown was a "bad manager." (*Id.*). Plaintiff concurred that no one wanted to work with Brown because "she made it hard for everyone." (*Id.* at ¶ 46).

On November 20, 2021, Plaintiff filed a Charge of Discrimination with the Illinois Department of Human Rights and EEOC, and on March 24, 2023, the EEOC issued Plaintiff a Notice of Right to Sue. (Dkt. 49 at ¶ 8). Plaintiff initially filed this lawsuit in June 2023, and her second amended complaint (the operative complaint) in October 2023. (Dkt. 13). Defendant moved for summary judgment following the completion of discovery; the motion is fully briefed.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to demonstrate "specific facts

showing that there is a genuine issue for trial," *id.* at 324, and support their position with "more than a scintilla of evidence." *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 709 (7th Cir. 2000). Summary judgment is the time for a litigant to "put up or shut up" by "show[ing] what evidence it has that would convince a trier of fact to accept its version of events." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) (quotations omitted). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, all "justifiable" inferences are drawn in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *see also Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022) (non-moving party receives "benefit of conflicting evidence" as well as "any favorable inferences that might be reasonably drawn from the evidence."). Additionally, a court must refrain from weighing evidence or making credibility determinations. *Johnson v. Advocate Health & Hosps., Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citation omitted).

## DISCUSSION

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . advancement . . . of employees, employee compensation, . . . and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a) (West 2009).[4] "As used in subsection (a), the term 'discriminate against a qualified individual on the basis of disability' includes . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would

---

[4] The parties do not dispute that Defendant is a covered entity under the ADA. (Dkt. 55 at ¶ 1).

impose an undue hardship on the operation of the business of such covered entity[.]" *Id.* at §

12112(b)(5)(A).

## I.        Failure to Accommodate (Count I)

Defendant contends that Plaintiff's failure to accommodate claim cannot succeed because

"Plaintiff failed to properly request accommodation and Defendant reasonably accommodated

Plaintiff when she made proper requests." (Def. Mot. Summ. J. at 137-38).[5] For a plaintiff to prove

a failure to accommodate claim, she "must show that: (1) [s]he is a qualified individual with a

disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably

accommodate the disability. *Schoper v. Bd. of Trs. of W. Ill. Univ.*, 119 F.4th 527, 532 (7th Cir.

2024) (quotations and citation omitted).

In this case, Defendant does not dispute that Plaintiff has a disability—carpal tunnel

syndrome[6]—or that Defendant was aware of her disability. (Def.'s Mem. in Supp. of Mot. for

Summ. J. at 147, Dkt. 40). Defendant also takes no position on whether Plaintiff is "qualified" and

so the Court presumes (without deciding) that to be true for summary judgment purposes. This

leaves Defendant's argument that it reasonably accommodated her disability by granting "each of

Plaintiff's legitimate requests for reasonable accommodation." (*Id.* at 147-150).

Upon notification by an employee that she has a disability, "the ADA obligates the

employer to engage with the employee in an interactive process to determine the appropriate

accommodation under the circumstances." *Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th

---

[5] Unless otherwise noted, page numbers in citations to the docket reference "PageID #" in the CM/ECF header of the filing, not other page numbers in the header or footer of the document.

[6] In her response, Plaintiff states that she "does not and has not only rested her failure to accommodate claim solely on [Defendant's] failure to accommodate [her] carpal tunnel syndrome," (Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. at 606-07; Dkt. 50), as she has a host of other health conditions of which Defendant is aware. However, Plaintiff has not suggested, through her briefing or statement of additional material facts, that she specifically sought an accommodation for any condition other than carpal tunnel syndrome.

Cir. 2000) (quotations and citation omitted). "This step imposes a duty upon employers to engage in a flexible, interactive process with the disabled employee needing accommodation so that, together, they might identify the employee's precise limitations and discuss accommodation which might enable the employee to continue working." *Id.* (quotations and citations omitted). But it is well-established that complaints about a physical or mental impairment, without more, do not constitute requests for reasonable accommodations.

In *Wells v. Winnebago Cnty., Ill.*, 820 F.3d 864, 867 (7th Cir. 2016), the Seventh Circuit held that the County had not failed to accommodate the plaintiff, despite her generally discussing her anxiety and requesting that she—a computer navigator who assisted self-represented litigants at the Winnebago County courthouse—be placed behind a counter or partition away from the public with whom she dealt. *Id.* The court explained that:

> [The Plaintiff] had not requested a counter or partition as an accommodation of a *disability*. True, the record shows that she mentioned anxiety and at least once a month asked to be placed behind a counter or partition. But she did not link that anxiety to a qualifying disability. Many people suffer anxiety without being disabled by it. The only time she submitted medical evidence of a qualifying condition, the relief she requested was . . . immediately granted.

*Id.* The same is true here. Certainly, the record reflects that Plaintiff made repeated requests for assistance in the pharmacy and complained about arm pain, but she never explicitly linked the two until 2019, when she formally requested an accommodation with medical documentation. Plaintiff argues that her emails and grievances and other gripes about the heavy workload coupled with Defendant's knowledge of her history of taking FMLA leave since 2015, should have triggered the obligation to explore her need for accommodation. Not so. Similar to anxiety, many people deal with pain on a daily basis, whether it be due to carpal tunnel syndrome, various forms or arthritis, or something else. Suffering from regular pain while on the job does not necessarily imply

10

that an employee is disabled because of it and in need of a reasonable accommodation to manage her duties.

The Seventh Circuit explained that the plaintiff in *Wells* "needed to establish that the County was required to treat her references to anxiety as notices of a link between her disability and her working conditions that would set off the process of considering possible accommodations" but she failed to "offer[] medical evidence demonstrating that a reasonable employer would understand every mention of an employee's anxiety as a disability[.]" *Wells*, 820 F.3d at 867. The court went on to reiterate that "our cases have consistently held that disabled employees must make their employers aware of any nonobvious, medically necessary accommodations with corroborating evidence such as a doctor's note or at least orally relaying a statement from a doctor, before an employer may be required under the ADA's reasonableness standard to provide a specific modest accommodation." *Id.* (citing *Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 976 (7th Cir.2009) (quotations omitted)).

Likewise, Plaintiff had to explicitly make Defendant aware of her need for an accommodation due to disability, which the evidence shows that she did in 2019 and in 2023 and received reasonable accommodations to her work schedule. At all other times, Plaintiff's general complaints about her assigned shift, overall workload, and other suggested changes were insufficient to trigger the duty of Defendant to initiate the interactive process. This includes her email to Krasucki in 2021 that mentioned arm pain without linking it to a qualifying disability.[7] Although Plaintiff insists that Defendant was on notice of all her disabling conditions, the Court agrees with Defendant that Plaintiff knew how to avail herself of the reasonable accommodation process and easily could have made her intentions clear each time she now says an accommodation

---

[7] Plaintiff was not diagnosed with carpal tunnel syndrome until 2022.

was sought. No doubt, Plaintiff was frustrated by Brown's continued harassment and experiencing pain. While she is correct that the law does not require employees to utter particular words to begin the conversation, it is equally true that employers are under no duty to read the tea leaves to decipher when an employee may be seeking relief under the ADA. When Plaintiff specifically asked in 2019 and 2023, she received reasonable accommodations.

Accordingly, summary judgment is granted in favor of Defendant on count I.

## II.      Interference (Count II)

Defendant next argues that Plaintiff's interference claim fails because "there is no evidence that Defendant intimidated, coerced, or threatened Plaintiff to dissuade her from exercising her rights under the ADA." (Def. Mot. Summ. J. at 138). A claim of interference under the ADA[8] requires a plaintiff to demonstrate "(1) she engaged in activity statutorily protected by the ADA; (2) she was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA protected rights; (3) the defendants coerced, threatened, intimidated, or interfered on account of her protected activity; and (4) the defendants were motivated by an intent to discriminate." *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550-51 (7th Cir. 2017). Defendant contends that Plaintiff "does not establish *any* of the elements of an ADA interference claim." (Def.'s Mem. in Supp. of Mot. for Summ. J. at 158, Dkt. 40) (emphasis in original). The Court need not determine whether Plaintiff meets the first two elements because it is clear that the record is devoid of any evidence from which a reasonable jury could infer that Defendant coerced, threatened, intimidated, or interfered on account of any protected activity or was motivated by an intent to discriminate.

---

[8] The ADA's prohibition of interference with statutorily protected rights is codified at 42 U.S.C. § 12203(b) and states "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."

"Interference requires more than a quarrel among neighbors or an isolated act of discrimination; instead, plaintiffs must demonstrate a pattern of harassment, invidiously motivated. . . . That is, to demonstrate the requisite intent, a plaintiff must show that the defendant's actions reveal a discriminatory pattern of harassment and an intent to discriminate based upon the plaintiff's membership in a protected class—those with disabilities." *Shaw v. Williams*, No. 16-cv-1065, 2018 WL 3740665, at \*11 (N.D. Ill. Aug. 7, 2018) (quotations and citations omitted). In *Shaw*, the court found that the plaintiff offered "none of the circumstantial evidence that typically supports finding discriminatory intent, such as discriminatory comments, different treatment for [others] outside of the protected class, or repeated expressions of animus." *Id.* at \*12. The same is true here.

While Plaintiff alleges that Brown treated her unfairly in a number of ways, including by mocking her,[9] failing to invite her to parties, and sending her mail order payments as "punishment," "isolated episodes" such as these do not show the pattern of discrimination necessary to demonstrate interference. Nor does Brown's behavior evince discriminatory intent, which requires a showing that Defendant "acted 'because of' and not merely 'in spite of' a prohibited factor." *Id.* (citation omitted). The record undoubtedly reflects that Brown was difficult to work with for both Plaintiff and others regardless of their disability status, but that lends credence to the Court's conclusion that Brown was not treating Plaintiff differently *because of* her disability. Plaintiff herself admitted that she did not know why Brown was so unkind, but she believed Brown simply did not like her and that animosity may have stemmed from Plaintiff's knowledge of an alleged affair between Brown and a former employee. On these bare facts, no

---

[9] The Court notes that Brown's mocking and school bus comment, while reprehensible, do not appear to relate to Plaintiff's carpal tunnel syndrome.

13

reasonable jury could conclude that Defendant coerced, threatened, intimidated, or interfered with Plaintiff's rights under the ADA on account of her disability, or that Defendant was motivated by an intent to discriminate because of her disability.

Accordingly, summary judgment is granted in favor of Defendant on count II.

## III.      Discrimination (Count III)

Finally, Defendant argues that Plaintiff's discrimination claim fails because Plaintiff has not presented any evidence that she suffered an adverse employment action because of her disability. (Def. Mot. Summ. J. at 138). "To prevail on a disability discrimination claim, a plaintiff must show (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) she suffered an adverse employment action; and (4) the adverse action was caused by her disability." *Schoper*, 119 F.4th at 534 (quotations and citation omitted). Defendant argues at length that Plaintiff did not suffer an adverse employment action (Def.'s Mem. in Supp. of Mot. for Summ. J. at 151-55, Dkt. 40), but the Court need not make such a determination. Even if Plaintiff suffered an adverse employment action, she cannot establish that it was caused by her disability.

At most, Plaintiff posits that her assignment to the busy 1:00PM to 9:00PM shift is discriminatory because no one else has to do it. When pressed further during her deposition, Plaintiff stated that the work was "put on [her]" and only her and that she "[didn't] know" why. (Pl.'s Dep. at 175:20-176:4, Def. Ex. 1; Dkt. 41-1). However, Plaintiff also testified that she believed Brown treated her unfairly because Plaintiff knew of Brown's alleged affair with a former employee. (*Id.* at 75:8-76:13) (". . . [the employee] would tell me all about it and [Brown] knew I knew. That's why [Brown] hated me. [Brown] knew I knew what was going on. [Brown] knew I knew what [she] was doing at that man's apartment. [Brown] knew I knew and [she] hated that I

14

knew. Q. So you believe that she began treating you unfairly because you— A. Yes. Q. –found out about this [affair] with [a former coworker who was also Plaintiff's friend]? A. Right, you're management and he's staff. You're overstepping your boundaries.").[10] Plaintiff herself, when asked to speculate about the reason for Brown's harsh treatment, never said it was because of her disability. In fact, the record contains no evidence whatsoever to suggest that Brown or any other employee of Defendant treated Plaintiff differently because of a disability.

Defendant further argues that Plaintiff cannot support a failure to promote claim, stating "[a]lthough Plaintiff's Second Amended Complaint does not include a failure to promote claim, she alleges in her Complaint that Defendant refused to promote her to Cashier II because of her alleged disability and instead awarded the position to less-experienced, non-disabled employees." (Def.'s Mem. in Supp. of Summ. J. at 156-58, Dkt. 40). It is unclear why Defendant addresses a claim raised in the original complaint but not the operative second amended complaint. Then again, Plaintiff's response brief addresses the abandoned failure to promote claim in the context of responding to Defendant's argument that her discrimination claim under the ADA fails. (Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. at 613-615, Dkt. 50).

Regardless, Plaintiff points to no facts in the record or legal authority to overcome Defendant's contention that any adverse action she sustained was not connected to her disability. Plaintiff suspects that she may have been denied promotions due to her disability as opposed to her lack of qualifications. But speculation is not enough at this stage of the case. *See Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024) ("Speculation cannot create a genuine issue of fact that defeats summary judgment.").

---

[10] Plaintiff's testimony goes so far as to suggest that Brown perhaps assigned Plaintiff to the 1:00PM shift because Plaintiff and Brown's alleged paramour used to go to lunch together at 12:00PM, and Brown wanted Plaintiff out of the picture so that he and Brown could have lunch alone. (Pl.'s Dep. at 75:17-76:1, Def. Ex. 1; Dkt. 41-1).

Accordingly, summary judgment in granted in favor of Defendant on count III.

## **CONCLUSION**

For all the foregoing reasons, Defendant's motion for summary judgment is granted.

**DATED**: September 24, 2025             **ENTERED**:

LaShonda A. Hunt
_____

LaSHONDA A. HUNT
United States District Judge

16